## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 29 2017, 10:55 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Jacob R. Cox
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

W. Brent Gill
Jason M. Smith
Seymour, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ed Wayt and Tex A. Wayt,

*Appellants-Defendants,*

v.

Phyllis I. Maschino, et al.,

*Appellees-Plaintiffs*

December 29, 2017

Court of Appeals Case No.
36A05-1702-CC-335

Appeal from the Jackson Superior Court

The Honorable Bruce Markel III, Judge

The Honorable Bruce A. MacTavish, Special Judge

Trial Court Cause No.
36D01-1208-CC-177

**Altice, Judge.**

**Case Summary**

[1] Ed and Tex Wayt (collectively, the Wayts) appeal from the trial court's entry of judgment against them and in favor of Phyllis Maschino in the amount of $83,000. The Wayts raise a number of arguments, all of which boil down to a broader assertion that the trial court's judgment was clearly erroneous.

[2] We affirm in part and remanded with instructions.

## Facts & Procedural History

[3] This case can be added to an unfortunately long list of cautionary tales concerning the perils of going into business with family members. At all times relevant to this appeal, Maschino has been the owner of a parcel of real estate on Blish Street in Seymour, Indiana.[1] Prior to the events at issue in this case, Maschino's son, Fred, operated a metal fabricating business called High Value Metal on the Blish Street property. After Fred's death, Maschino's daughter and son-in-law, Rebecca and Johnny Brassington, continued to operate High Value Metal.

[4] In the late 1990s, Ed Wayt—another of Maschino's sons-in-law—was running a sandblasting business in Brownstown, Indiana. Ed was interested in moving his business to a new location because the facilities were inadequate and he was having problems with his landlord. Ed and his wife, Tex, eventually came to an

---

[1] To be more precise, the Blish Street property is currently owned by 101 Blish Street A, LLC, of which Maschino is the sole owner. Maschino transferred ownership of the property to the LLC by quitclaim deed in 2011. For purposes of clarity, we will refer to both Maschino and the LLC as Maschino.

agreement with Maschino, Tex's mother, to run a blasting facility that would be built on Maschino's Blish Street property next to High Value Metal. The parties believed the arrangement would be mutually beneficial, as it would provide Ed with superior facilities and equipment and the addition of an on-site blasting business would create more business opportunities for High Value Metal.

[5] Thereafter, Maschino sought and was granted a variance to allow the construction of the new blasting facility on the Blish Street property. Maschino made a $27,000 down payment toward the purchase of blasting equipment, and she took out loans in the amount of $80,000 and $120,000 to finance the construction of the building and to complete the purchase of the necessary equipment. Maschino also guaranteed an additional $50,000 loan to cover operating expenses. The Wayts began operating the blasting business in 1999 under the name "The Blast Shop." Maschino did not participate in The Blast Shop's operations, and she did not have a key to the building.

[6] Maschino did not charge the Wayts rent or take any of The Blast Shop's profits, but it was agreed that the Wayts would make the payments on the outstanding loans. There was no discussion of whether the Wayts would pay interest, and because the parties were family and trusted each other, they did not seek the advice of counsel or reduce their agreement to writing.

[7] Over the next several years, Maschino made numerous loan payments for the Wayts when they were unable to do so, and she refinanced the loans on at least

two occasions. Maschino also made a number of cash loans to cover The Blast Shop's operating expenses over the years. By 2012, the Wayts had made loan payments totaling $201,000, and Maschino still owed approximately $133,000 on the refinanced loans.

[8] In 2012, the Wayts entered into negotiations with Crane Hill Machine and Fabrication, Inc. (Crane Hill), and its owner, Marshall Royalty. Without Maschino's knowledge or consent, the Wayts entered into an agreement to sell The Blast Shop and its equipment to Crane Hill and/or Royalty for $70,000.[2] The agreement did not contain a provision for the repayment of Maschino's outstanding loan balance. When Maschino learned of the attempted sale, she locked the Wayts and Royalty out of The Blast Shop facility and claimed ownership of the business and its equipment.

[9] On August 31, 2012, two competing lawsuits were filed contesting the ownership of The Blast Shop's equipment. Maschino filed a complaint against Royalty, Crane Hill, and the Wayts for trespass, criminal conversion, constructive fraud, unjust enrichment, and breach of contract. On the same day, Royalty filed a complaint against Maschino for replevin and conversion and against the Wayts for fraud and breach of contract. On April 4, 2013, Maschino filed a motion for summary judgment, in which she argued that she

---

[2] The agreement provided further that the Wayts would sell their separate powder coating business to Crane Hill and that Ed would go to work for Crane Hill. These portions of the agreement were fulfilled and are not at issue in this case.

was entitled to summary judgment in her favor on all of Royalty's claims against her. Maschino's arguments were based on designated evidence that although Royalty claimed in his complaint that he had purchased certain equipment from the Wayts, he admitted in a subsequent deposition that he had "walked away" from the purchase prior to filing his complaint. *Cross-Appellee's Appendix Vol. 2* at 16. Royalty filed a response to Maschino's motion, but the Wayts did not. On July 29, 2013, the trial court entered an order granting Maschino partial summary judgment against Royalty. Maschino and Royalty ultimately reached a settlement and stipulated to the dismissal of their remaining claims against each other. Royalty also stipulated to the dismissal without prejudice of his claims against the Wayts.

[10] On August 9, 2013, the Wayts filed an amended answer, in which they claimed ownership of The Blast Shop equipment and alleged that Maschino had interfered with the sale of the equipment to Crane Hill. They also asserted counterclaims of conversion, replevin, and negligence regarding the equipment. The Wayts subsequently added claims for unjust enrichment and unlawful eviction.

[11] Maschino filed a second motion for summary judgment on October 3, 2014, in which she argued that the trial court had already found in its July 29, 2013 summary judgment order that Maschino owned the relevant equipment and that the Wayts were precluded from presenting evidence to challenge that finding due to their failure to respond to her first motion for summary

judgment. The Wayts filed a cross-motion for summary judgment on October 30, 2015. Both motions were denied on September 27, 2016.

[12] A bench trial was held on October 27, 2016, at the conclusion of which the trial court entered judgment in Maschino's favor in the amount of $83,000. Specifically, the court found that Maschino had loaned the Wayts a total of $354,000 and that the Wayts had repaid a total of $201,000, leaving a balance of $153,000. The court found further that the Wayts had been the owners of the blasting equipment Maschino had retained, and that Maschino consequently owed the Wayts a $70,000 offset for the value of the equipment,[3] resulting in a net judgment of $83,000. Maschino was also ordered to return certain personal property belonging to Ed within fifteen days of the court's order. The Wayts now appeal.

## Discussion & Decision

[13] The trial court in this case entered special findings and conclusions thereon pursuant to Ind. Trial Rule 52(A). Our standard of review is well settled:

> [W]e apply a two-tiered standard of review for clear error; that is, first, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Mysliwy v. Mysliwy*, 953 N.E.2d 1072, 1075-76 (Ind. Ct. App. 2011) (citations omitted), *trans. denied*. We do not reweigh the evidence

---

[3] Neither party takes issue with the court's decision to award an offset for the value of the equipment rather than order the equipment returned to the Wayts. There was testimony presented at trial that the removal of the equipment would cause significant damage to the building.

but consider the evidence favorable to the judgment. *Id.*
Findings of fact are clearly erroneous when the record contains
no facts to support them, and a judgment is clearly erroneous if
no evidence supports the findings, the findings fail to support the
judgment, or if the trial court applies an incorrect legal standard.
*Bowyer v. Ind. Dep't of Natural Res.*, 944 N.E.2d 972, 983-84 (Ind.
Ct. App. 2011). Although we review findings under the clearly
erroneous standard, we review conclusions of law de novo. *Id.* at
983.

*Carmer v. Carmer*, 45 N.E.3d 512, 516-17 (Ind. Ct. App. 2015).

[14] Moreover, this court has noted that the purpose of such findings and conclusions is to provide the parties and reviewing court with the legal theory upon which the trial court relied. *Estate of Kappel v. Kappel*, 979 N.E.2d 642, 652 (Ind. Ct. App. 2012). "We may affirm a judgment on any legal theory, whether or not relied upon by the trial court, so long as the trial court's findings are not clearly erroneous and support the theory adopted." *Id.* Furthermore, where the trial court's findings are adequate to support its judgment on one legal theory, findings on another legal theory are mere surplusage and cannot support reversal even if erroneous. *Id.*

[15] Before reaching the Wayts' claims, we must first address Maschino's arguments concerning the ownership of The Blast Shop equipment. Maschino argues that the trial court "implicitly" found that she owned the equipment or, alternatively, erred in failing to find that the issue of the ownership of the equipment had previously been resolved in her favor in the trial court's July 29, 2013 order on her first motion for summary judgment, to which the Wayts did

not respond.[4] *Appellees' Brief* at 15. Our review of the trial court's order reveals that it concluded that the Wayts had used loans from Maschino to purchase the equipment, and were consequently the owners of said equipment at the time it was purchased. The trial court went on to conclude, however, that Maschino was the entitled to keep equipment, perhaps because it had been affixed to her real property and could not be removed without damaging the building, but that she owed the Wayts the value of the property. In any event, because neither party challenges the trial court's decision to award the equipment to Maschino and an offset to the Wayts, Maschino's arguments with respect to the trial court's disposition of the equipment are of no consequence.[5]

[16] We now turn our attention to the Wayts' appellate arguments. The Wayts first argue that the trial court erred by entering judgment on claims not raised in Maschino's complaint. Specifically, the Wayts note that Maschino's complaint asserted a breach of contract claim for the Wayts' failure to repay loans in the amount of "approximately $200,000[.]" *Appellant's Appendix Vol. 2* at 50. According to the Wayts, this claim referred only to the $120,000 and $80,000

---

[4] In a footnote, Maschino refers to the latter argument as a cross-appeal. We note, however, that Maschino asks us to affirm the trial court in all respects.

[5] Nevertheless, we note that Maschino overstates the scope of the July 29, 2013 summary judgment order. That order did not, as Maschino claims, settle the issue of who owned the Blast Shop equipment; rather, it simply ruled that Royalty and Crane Hill were *not* the owners. Indeed, in the motion for summary judgment giving rise to the July 29, 2013 order, Maschino's sole argument was that she was entitled to summary judgment on Royalty's claims of conversion and replevin because Royalty had disclaimed ownership of the equipment. Because Maschino did not seek summary judgment against the Wayts on any issue, it is unsurprising that the Wayts did not file a response. Our conclusion is further supported by the trial court's denial of Maschino's second motion for summary judgment, in which she unsuccessfully raised this precise argument. In sum, Maschino's arguments in this regard are unconvincing.

loans Maschino obtained to build and outfit The Blast Shop, and that the trial court therefore erred in entering judgment for amounts relating to the loan payments Maschino made on the Wayts' behalf and the cash loans Maschino made to the Wayts over the years. We note, however, that Maschino's complaint alleged that, aside from the $120,000 and $80,000 loans, "from 1999 through 2012, Ms. Maschino loaned approximately $200,000 to Tex and Ed Wayt to finance the operations of The Blast Shop, Inc." *Id.* at 3. Moreover, the complaint did not characterize the $120,000 and $80,000 loans Maschino obtained as loans to the Wayts, because it was Maschino's position that she was the owner of the Blast Shop and its equipment. It is therefore apparent from the face of the complaint that the various loans Maschino made to the Wayts between 1999 and 2012 were the basis of the breach of contract claim she asserted.[6] There is no question that the Wayts were on notice that those loans could be at issue at trial.[7]

---

[6] The Wayts also direct our attention to Maschino's answer to an interrogatory wherein she was asked to identify all loans forming the basis of her breach of contract claim. After objecting on the basis that the question was vague, ambiguous, and confusing, as well as on the basis that discovery was ongoing, Maschino answered, "[i]n the spirit of discovery," by listing the $80,000 and $120,000 loans. *Exhibit Volume 2* at 142. Although this answer was certainly incomplete, it was made over a year before trial, while discovery was ongoing and before the parties' theories of recovery had fully solidified. In any event, the Wayts have not directed us to any authority supporting a conclusion that Maschino's incomplete answer to the interrogatory must result in forfeiture of the claims she raised in her complaint. We note further that the Wayts make no argument that evidence relating to the loans made between 1999 and 2012 was not disclosed in discovery or that they were in any way surprised by Maschino's arguments concerning those loans.

[7] The Wayts also take issue with the trial court's finding that Maschino's claims were supported under a theory of unjust enrichment, noting that Maschino's unjust enrichment claim had been asserted against Royalty only. We note, however, that the trial court found that Maschino's claims were valid under either a theory of unjust enrichment *or* breach of contract. Because we affirm the trial court's judgment on the basis of breach of contract, we need not address the Wayts' argument concerning unjust enrichment.

[17]     The Wayts next argue that Maschino's claims regarding the loan payments she made on the Wayts' behalf and her cash loans to the Wayts between 1999 and 2012 are barred by the statute of frauds. Because the Wayts did not plead the statute of frauds as an affirmative defense in their answer or raise the argument at trial, this issue is waived. *See Jernas v. Gumz*, 53 N.E.3d 434, 447-48 (Ind. Ct. App. 2016) (explaining that the statute of frauds is an affirmative defense that must be specifically pled pursuant to Ind. Trial Rule 8(C)), *trans. denied*; *Lawshe v. Glen Park Lumber Co., Inc.*, 375 N.E.2d 275, 347 (Ind. Ct. App. 1978) (explaining that in order to preserve the statute of frauds as an affirmative defense, the party with the burden of proof must either have set forth the defense in a responsive pleading or show the defense was litigated by the parties).

[18]     Waiver notwithstanding, the Wayts have not established that the statute of frauds applies. The Wayts argue that the agreement in this case falls under Ind. Code § 32-21-1-1(b)(5), which requires "any agreement that is not to be performed within one (1) year from the making of the agreement" to be in writing to be enforceable. As this court has explained, the one-year clause of the statute of frauds applies "only to contracts which, by the express stipulations of the parties, were not to be performed within a year, and not to those which might or might not upon a contingency, be performed within a year." *Tobin v. Ruman*, 819 N.E.2d 78, 85 (Ind. Ct. App. 2004) (quoting *Wallem v. CLS Indus., Inc.*, 725 N.E.2d 880, 887 (Ind. Ct. App. 2000)), *trans. denied*. In other words, "it is apparent that only if it is *impossible* for an oral contract to be completed

within one year does it fall within the Statute of Frauds." *Id.* (emphasis in original).

[19] Although the Wayts admit that the parties did not discuss a term for repayment of the loans, they assert that "it is clear that Maschino did not expect or anticipate the Wayts repaying them in less than a year[.]" *Appellants' Brief* at 17. Although we do not doubt the Wayts' assertion in this regard, such an expectation is insufficient to bring the agreement within the statute of frauds' one-year clause.

[20] Next, the Wayts argue that the trial court erred in finding that the $50,000 loan Maschino guaranteed constitutes a loan from her to the Wayts. According to the Wayts, the evidence presented regarding these funds establishes that they were not a loan at all, but a revolving line of credit. Furthermore, the Wayts argue that the borrower was The Blast Shop, Inc., not Maschino. The Wayts do not dispute that Maschino guaranteed the line of credit, but they argue that no evidence was produced as to whether or how much of this line of credit was used, what the balance was on any given day, or that Maschino was ever called upon to act in her capacity as guarantor.

[21] Whether we call the $50,000 a loan or a line of credit, the evidence presented at trial establishes that the funds were placed into a checking account Tex used to pay operating expenses. Indeed, both Maschino and Tex testified to that effect. Furthermore, although the funds were originally obtained in the name of The Blast Shop, the loan/line of credit was refinanced into Maschino's sole name in

2003 and its balance at that time was $41,343.26. Although the Wayts appear to have made some payments toward the loan/line of credit, the Wayts have not established that these payments were not included in the $201,000 total the trial court found the Wayts had paid toward the loans and deducted from the amount they still owed.[8]

[22] Next, the Wayts argue that the trial court erred in finding that Maschino made a total of $77,000 in additional loans to the Wayts, consisting of "$27,000 while the business was operating and for payments on the second mortgage and $50,000 in additional funds to help operate the business." *Appellants' Appendix Vol. 2* at 36. The Wayts note that Maschino presented evidence that she had made cash loans and loan payments on the Wayts' behalf over the years, but the amounts she claimed do not equal $77,000. We observe, however, that Maschino presented evidence that her total additional loans to the Wayts far exceeded that amount. Indeed, Maschino presented evidence that she had made over $47,000 in loan payments for the Wayts and nearly $90,000 in additional cash loans. The trial court apparently found only some of Maschino's evidence in this regard to be worthy of credit. Although the trial court did not elaborate on the reasoning behind this decision, it was not

[8] The exhibits in this case are voluminous, spanning a total of sixteen volumes. They include numerous bank statements, cancelled checks, and other financial documents, the significance of which are not always immediately apparent. It is not our duty to scour the record in search of support for a litigant's claims, and we have not done so here. *See Legacy Healthcare, Inc. v. Barnes & Thornburg*, 837 N.E.2d 619, 639 n.29 (Ind. Ct. App. 2005), *trans. denied*.

required to do so. The trial court's finding that Maschino made additional loans totaling $77,000 was well within the scope of the evidence presented.[9]

[23] Finally, the Wayts argue that the trial court erred when it ordered Maschino to return only three of the several items of personal property belonging to the Wayts that had been left at The Blast Shop when Maschino locked them out. The trial court's order provided in relevant part as follows: "The Court further orders Mashino [sic] to return the items of personal property Mr. Wayt owned that Mashino [sic] converted 1. Wood Furnace, 2. Fan, and 3. Air Compressor within 15 days of this order." *Appellants' Appendix Vol. 2* at 37. On appeal, the Wayts argue that they were also entitled to the return of other personal property, including, among other things, various furniture and tools, a brass bell, and the spare tire to Ed's truck. Maschino did not dispute having these items or that they belonged to the Wayts, and in closing argument, her attorney stated that Maschino was willing to return them. *Transcript Vol. 3* at 6. On appeal, however, Maschino argues that the trial court may have treated the unreturned personal property as an additional offset, which might account for the discrepancy between the amount of cash loans and loan payments

---

[9] The Wayts also argue, briefly and without citation to the record or authority, that Maschino made these loans not to the Wayts, but to The Blast Shop, Inc., a separate corporate entity that Maschino did not add as a party to this litigation, and that the Wayts therefore cannot be held personally liable for such loans. This argument is doubly waived, both for failure to raise it before the trial court and failure to make a cogent argument. *See K.S. v. D.S.*, 64 N.E.3d 1209, 1212 (Ind. Ct. App. 2016) (explaining that a party waives any issue for which it fails to develop cogent argument or provide adequate citation to authority); *Mid-States Gen. & Mech. Contracting Corp. v. Town of Goodland*, 811 N.E.2d 425, 436 (Ind. Ct. App. 2004) (explaining that "[a]n appellant who presents an issue for the first time on appeal waives the issue for purposes of appellate review").

Maschino claimed to have made and the $77,000 the trial court awarded for those expenditures.

[24] As an initial matter, it is not entirely clear to us that the three items listed in the trial court's order were intended to constitute an exhaustive list. Further, we find Maschino's argument concerning a possible offset to be unconvincing. There was no evidence presented concerning the value of the unreturned personal property, and many of the items would appear to have very little monetary value. Moreover, given that the trial court made the manner in which it calculated damages quite clear, it seems unlikely that it would have awarded an offset without expressly stating that it had done so. Because it seems likely to us that the trial court's failure to mention the unreturned personal property was an oversight rather than an intentional decision to award such property to Maschino, we remand with instructions to clarify its order with respect to the ownership of such property.

[25] Judgment affirmed in part and remanded with instructions.

[26] Baker, J. and Bailey, J., concur.